In re Estate of Mary Lewicki, Deceased.
Joe Barjarinas, Appellant, v. Josephine Lewicki et al.,
Appellees.

Gen. No. 37,930.

Opinion filed November 5, 1935.

LINDSAY & SCHACHNER, of Chicago, for appellant.

ADAMS, ADAMS & WHITE, of Chicago, for appellees; J. THOMPSON WHITE, of counsel.

MR. JUSTICE SULLIVAN delivered the opinion of the court.

Mary Lewicki died April 16, 1932. March 3, 1933, a writing purporting to be her last will and testament, theretofore presented to the probate court, was refused probate. Upon appeal to the circuit court by the proponent, Joe Barjarinas, it was found that "at the time of the said writing read in evidence, purporting to be the last will and testament of the said Mary Lewicki, deceased, it was not and is not her last will and testament," and judgment was entered on such finding. This appeal seeks to reverse the judgment of the circuit court.

The probate of the alleged will is contested by the three children of deceased, one of whom was a minor at the time of the hearing in the circuit court. That

portion of the instrument in controversy and the signed attestation clause are as follows:

"After the payment of such debts and funeral expenses, I give, devise and bequeath to Joseph Barjarinas, the sum of Nine Thousand ($9,000) Dollars, being his wage and earnings since March, 1925, while in my employ, for his faithful service to me in full, and remaining of my estate real and personal or mixed, which I may die seized or possessed of, or which may belong to me, I give, devise and bequeath to my three (3) children, namely, Josephine Lewicki, Anna Lewicki, and John Lewicki, to be divided equally, share and share alike.

"...

"In Witness Whereof, I have hereunto set my hand and seal this 13th day of April, 1932.

her<br>
"(Signed)  Mary X Lewicki<br>
Mark.

"This instrument was on the day of its date, signed, sealed, published and declared by the said Mary Lewicki as and for her last Will and Testament, in the presence of the undersigned, who at her request and in her presence and in the presence of each other have hereunto subscribed our names as witnesses thereto.

John J. Zolp residing No. 6627 So. Richmond St.

Mary Klusas residing No. 4506 So. Albany Ave.

George Kveder residing No. 4506 So. Albany Ave."

The only question presented for our determination is whether or not the requirements of section 2 of the statute on Wills (ch. 148, Ill. State Bar Stats. 1935) have been complied with.

To entitle a will to probate under that section (1) it must be in writing, signed by the testator or testatrix or in his or her presence by someone under his or her direction; (2) it must be attested by two or more credible witnesses; (3) two attesting witnesses must declare under oath in the county court (probate court)

that they saw the testator or testatrix sign the will in their presence or that he or she acknowledged the same to be his or her act or deed; and (4) two attesting witnesses must also declare under oath that they believed that the testator or testatrix was of sound mind and memory at the time of signing or acknowledging the will.

All three attesting witnesses testified in this cause and identified their signatures. Zolp, who drew the instrument in question and was also an attesting witness, had been a friend of Barjarinas for a number of years, as well as of deceased, for whom he said he had previously closed some real estate deals. He was convicted in the criminal court of Cook county, March 15, 1933, on an indictment charging that he obtained money by means of the confidence game and sentenced to the penitentiary, from which he was returned to testify on proponent's petition.

Zolp testified that after he had drawn the instrument he brought it into the bedroom where Mrs. Lewicki was lying ill and read its contents to her in English and then in Lithuanian; that she signed same by making her mark and that he then wrote in her name (Mary, before her mark, and Lewicki after it); that he then signed his name as a witness to the will; that the two other attesting witnesses, Mary Klusas and George Kveder, saw deceased sign the paper, and that they signed the same as witnesses in her presence and in his. After testifying that "I do not know whether Mrs. Lewicki understood what I said or not," he went on to state, "after I read this will I naturally asked her if she understood, but how this assent of hers to the signature was conveyed to me, I do not remember whether she nodded or whether she spoke."

On cross-examination he testified that when he first entered the Lewicki home he was led into Mrs. Lewicki's sick room and "in the course of our conversation that lasted say twenty minutes or more, it de-

veloped, or rather, it was conveyed to me that she desired to make a will.'' Then when asked what language, if any, she used in talking to him, he said, ''I spoke to her first, I asked, I recall, about the will, that I understand the will is to be made or words to that effect, and I says, 'Who are the heirs to be benefited in the will.' I understood, either from her by a nod or occasionally here a word, here and there, that the estate was to be divided equally between the children, Josephine, the oldest daughter, and the youngest daughter, and the boy that was still a minor.''

He then testified that he left Mrs. Lewicki and went into the kitchen to prepare his pencil notes on the will and someone there said, ''How about Joe (Barjarinas''; that after much discussion and wrangling among a group in the kitchen, including Barjarinas, as to what provision should be made for him in the will, Barjarinas ''went in (Mrs. Lewicki's bedroom) and they (Barjarinas and Mrs. Lewicki) were closeted in there, in the bedroom, for a portion of the day, I would not say how long, and then when he emerged from the bedroom, he said that . . . nine thousand dollars was a near figure at $25 a week for about seven years''; that the witness then prepared the will; that he read it to Mrs. Lewicki in English and then in Lithuanian and asked her if she understood it; that ''how she made the assent, whether it was by nod or motion of the hand, I accepted it, I thought that she conveyed the idea it was all right''; that if anyone took her hand and assisted her to make the cross, ''I would myself''; and that the oldest daughter of the deceased, Josephine, objected to the insertion in the will of the bequest to Barjarinas. The following is also a portion of Zolp's cross-examination:

''Q. Do you know what was the trouble with her?

''A. No, no, in walking I noticed that the abdomen was very highly raised, she was in great pain as far as I could understand.

"Q. Was she unconscious?

"A. I would not say that she was unconscious, I am not positive, I would not say; she was sort of in a comatose state. She was a very sick lady, that is one thing I know.

"Q. Do you still say that she was in a semi-comatose condition?

"A. I do not know what the word particularly means. In everyday meaning of this, the English acceptance of the word, common words, I would say that she was a very sick woman.

"Q. Do you know what coma means?

"A. I know that a person is actually suspended—well,—he is without ability to understand or make a motion.

"Q. Was she in that condition?

"A. I would not say because at times she would grunt and speak some intelligible words here and there, phrases.

"Q. What (would) she say?

"A. If I would make up any sentence now, that would be my pointed sentence, that would not be hers, I could not say what she said, but occasionally, here and there, she would say something.

"Q. Were her eyes opened or closed?

"A. At times they were closed and at times open.

"Q. Would you say that she was of sound mind and disposing memory at the time you went there?

"A. That is a rather advanced thought, I would not say anything."

Anna Klusas, a sister of deceased and one of the attesting witnesses, testified that Zolp asked her to sign the instrument in the bedroom where Mrs. Lewicki "was laying sick"; that the only persons in the room at that time were the deceased, her two daughters and Zolp; that at the time she (Anna Klusas) signed the will, Mrs. Lewicki "was like dead, she was unconscious, I could not talk to her"; that deceased

did not ask her to sign as a witness; that she did not see Mrs. Lewicki sign the "will"; that she did not hear the document read to Mrs. Lewicki; that she did not see Zolp sign; that, when asked whether at the time "you signed this will" Mary Lewicki was of sound mind and memory, she answered "no, she was unconscious"; that she (Anna Klusas) could not read English and that "this will" was not read to her; and that "Mr. Zolp asked me to sign as a witness to the will for the children."

George Kveder testified that Zolp asked him to sign the document; that Mrs. Lewicki did not talk to him at the time he signed as a witness; that he did not see her make any mark on the will; that when he signed she was "very sick" and that "she was unconscious"; that he did not hear the "will" read to Mrs. Lewicki, either in English or Lithuanian; that he' does not read English and that it was not read to him in any language; and that Anna Klusas was not in the room when he signed and he did not see her sign.

Mrs. Lewicki was removed to the hospital shortly after the purported will was signed April 13, 1932.

Dr. John F. Ruzic testified that he examined and talked with the deceased at her home at about 9:30 or 10 a. m. April 13, 1932, and again shortly after noon of the same day at the hospital, and found her in a very serious condition suffering from kidney, bowel and pulmonary disorders of a malignant nature, which caused her death three days later; and that on the occasion of both examinations she was conscious and, in his opinion, "of sound and disposing mind." Dr. James G. Gallagher, an interne, who saw the deceased for the first time when she was brought to the hospital about noon April 13, 1932, testified substantially to the same effect.

The only other witness was Ursula Lunekas, at whose home the proponent resides and whose testi-

mony, in many respects, was in direct contradiction to that of Zolp heretofore set forth. She stated that Zolp first presented and read to Mrs. Lewicki a will that contained a bequest of $12,000 to Barjarinas; that the deceased said that was too much; that he then brought in another will providing for the $9,000 bequest; that the deceased called Barjarinas into the bedroom and he said it was ''all right''; that Josephine Lewicki, the oldest daughter of deceased, was satisfied with the will and made no protest; and that Zolp handed Josephine the paper and she propped her mother up in bed to sign it, which she did by making a cross.

It is not the duty of a proponent to show that the will is valid in all respects. It is his duty only to make proof of the essentials mentioned in the statute. When he has done this a prima facie case entitling the will to probate has been made out. Neither the probate court, nor the circuit court on appeal, has power to refuse a will to probate upon any ground whatsoever other than a failure of the proponent to make proper proof of the requirements mentioned in sec. 2, or because proof of fraud, forgery, compulsion or other improper conduct appears which is deemed sufficient to invalidate or destroy the will. (*Hill v. Chicago Title & Trust Co.*, 322 Ill. 42; *Shepherd v. Yokum*, 323 Ill. 328.) However, sec. 2 of the Wills Act is mandatory and before a will can be admitted to probate it is imperative that two attesting witnesses declare on oath that they were present and saw the testator or testatrix sign the instrument or heard him or her acknowledge it as his or her act and deed and that they believed the testator or testatrix was of sound mind and memory at the time he or she signed or acknowledged same.

It has repeatedly been held that on the hearing in the circuit court on the due execution of the instru-

ment involved, the question of fact presented is determined by the same rules and presumptions which control the trial of other questions of fact, and that the instrument should be admitted to record if its genuineness and due execution are established by evidence competent to establish a will in chancery. (*Kaul v. Lyman*, 259 Ill. 30; *In re Will of Simon*, 266 Ill. 304; *Hutchison v. Kelly*, 276 Ill. 438; *Beck v. Lash*, 303 Ill. 549; *In re Will of Porter*, 309 Ill. 220.)

The only one of the attesting witnesses who said that he saw the deceased make her cross was Zolp. The other two testified that they did not see her make the cross and that she did not acknowledge to them that she had made it or indicate in any manner that it was her last will and testament. It is true that Zolp's testimony as to Mrs. Lewicki's signature and the attestation of the instrument was corroborated by that of the witness Ursula Lunekas, and it has been held that the proponent is not bound in the circuit court to rely solely upon the evidence of the witnesses who attested the will to meet the imperative requirement that there must be the concurring evidence of two witnesses to authorize probate of a will, but he may prove its execution and attestation by other competent witnesses. (*Crowley v. Crowley*, 80 Ill. 469; *Hill v. Kehr*, 228 Ill. 204; *Schofield v. Thomas*, 236 Ill. 417; *Stone v. Stone*, 281 Ill. 474; *Hill v. Chicago Title & Trust Co., supra.*) No other witness in this case mentioned Ursula Lunekas as even having been in the room when and where the document is claimed to have been signed and attested. Her evidence is in sharp conflict with that of Zolp as to what occurred there and a comparison of their testimony, as heretofore set forth, clearly indicates that either or both of them are unworthy of belief. If we assume that Zolp related truthfully what occurred on the occasion in question, her testimony is so fanciful that we must conclude that she was not even present. Subjecting the testimony of Zolp and

Ursula Lunekas to the ordinary rules for testing the credibility of witnesses, the conclusion is inevitable that it has not been shown by credible evidence as required by the statute that two of the attesting witnesses were present and saw the deceased sign the instrument in question or heard her acknowledge it as her act and deed. In fact we entertain grave doubt, under all the facts and circumstances, as to whether she signed the instrument at all.

Has it been shown by credible evidence that Mrs. Lewicki was of sound mind and memory at the time she is alleged to have signed the purported will? The doctors were not present when the instrument was said to have been executed and attested and necessarily were unable to state the condition of deceased at that time. Zolp testified that prior to reading the document to deceased, his last direction from her was to draw a will making her children the beneficiaries of her entire estate. Notwithstanding this he states that the instrument he prepared and claims to have read to her contained a $9,000 bequest to Barjarinas, who had been employed in her butcher shop for a number of years. Referring to the time that he said he read the instrument to her he testified variously: "I do not remember whether Mrs. Lewicki understood what I said or not"; "I do not remember whether she nodded or whether she spoke (her assent)"; "I thought that she conveyed the idea it was all right"; "I would not say; she was sort of in a comatose state"; "she was a very sick lady"; "is without ability to understand or make a motion"; "I could not say what she said, but occasionally here and there, she would say something"; and "I would not say anything" as to whether she was of "sound mind and disposing memory." Of the two other attesting witnesses, Anna Klusas said that Mrs. Lewicki "was like dead, she was unconscious, I could not talk to her" and Kveder said that she was "very sick . . . she was unconscious"

when he signed the paper at Zolp's solicitation. In spite of this and other testimony of the three attesting witnesses, and in spite of Mrs. Lewicki's admitted desperate condition, Ursula Lunekas declared that she was "all right" and understood what was going on around her; that she heard her talk to Anna Klusas and George Kveder; that Mrs. Lewicki "then talked that $12,000 too much, then make another figure, make it $9,000, under will"; that Zolp "then brought another will up to the bed room"; and that "Mrs. Lewicki agreed with that and then called Joe Barjarinas and asked if he is satisfied with that."

It will be noted that the attestation clause contained no declaration that Mrs. Lewicki was of sound mind and memory and surely it cannot be gleaned from the testimony of any of the three attesting witnesses that they believed that the deceased was of sound mind and memory at the time of the alleged signing of the instrument. Even though credence was given to the improbable story of Ursula Lunekas, still the proof would fall short of the imperative requirement of the statute that there must be the concurring evidence of two witnesses that they believed deceased to have been of sound mind and memory at the time of the alleged signing of the purported will.

Although every reasonable presumption must be indulged in favor of the due execution and attestation of the instrument in question, nevertheless we think that it is still readily apparent from the evidence that the statutory requirements were not complied with and, therefore, the circuit court had power to refuse the will to probate.

For the reasons indicated herein the judgment of the circuit court is affirmed.

*Affirmed.*

SCANLAN, P. J., and FRIEND, J., concur.